5297-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| HEAVY METAL CAPITAL PARTNERS, LLC, a Florida limited liability company; DAVID C. SMITH, an individual; and RICHARD H. SEGERSON, an individual, ) ) ) ) ) | CASE NO.: 9:25-CV-81451 (MIDDLEBROOKS/MATTHEWMAN) |
| Plaintiffs, ) | |
| v. ) | |
| CARBONATIK, LLC, a Florida limited liability company, CARBONATIK GRAMINET, LLC, a Florida limited liability company, JOSEPH K. SWAMINATHAN a/k/a JOSEPH SWAMINATH, an individual, and BRENDAN FITZPATRICK, an individual, and DADEX GROUP LTD., a foreign entity, ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, HEAVY METAL CAPITAL PARTNERS, LLC, a Florida limited liability company; DAVID C. SMITH, an individual; and RICHARD H. SEGERSON, an individual, hereby sue Defendants, CARBONATIK, LLC, a Florida limited liability company; CARBONATIK GRAMINET, LLC, a Florida limited liability company; JOSEPH K. SWAMINATHAN, also known as JOSEPH SWAMINATH, an individual; and BRENDAN FITZPATRICK, an individual, and DADEX GROUP LTD. ("DaDEX") (collectively, "Defendants"), and state and allege as follows:

- 1 -

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Heavy Metal Capital Partners, LLC ("Heavy Metal"), is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.

2. Plaintiff, David C. Smith ("Smith"), is a citizen of the State of Colorado and is otherwise *sui juris*.

3. Plaintiff, Richard H. Segerson ("Segerson"), is a citizen of the State of Florida and is otherwise *sui juris*.

4. Defendant, Carbonatik, LLC, is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.

5. Defendant, Carbonatik Graminet, LLC ("Carbonatik Graminet"), is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.

6. Carbonatik, LLC is Manager of Carbonatik Graminet.  Occasionally in this Complaint, Carbonatik, LLC and Carbonatik Graminet are referred to together as "Carbonatik."

7. Defendant, Joseph K. Swaminathan, also known as Joseph Swaminath ("Swaminathan"), is a citizen of the State of Florida.  He is Chief Executive Officer of Carbonatik, LLC and a co-Manager (with Carbonatik, LLC) of Carbonatik Graminet.

8. Defendant, Brendan Fitzpatrick ("Fitzpatrick"), is a citizen of the State of Florida and President of Carbonatik, LLC.

- 2 -

9.     Defendant, DaDEX Group Ltd. ("DaDEX"), is a foreign entity that held itself out as the "Financial & Equity Partner" and designated financial intermediary for the Carbonatik transactions described herein, including control over SBLC-related financial instruments and trade-desk operations. On information and belief, DaDEX conducted business in the United States and purposefully directed activities toward this District.

10.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

11.    This Court has supplemental jurisdiction over all related state-law claims under 28 U.S.C. § 1367.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants reside in this District, and the acts of which Plaintiffs complain occurred in this District.

## FACTS COMMON TO ALL COUNTS

13.    In January 2025, Defendants approached Heavy Metal and represented that they had "hundreds of millions of dollars" available to deploy into U.S. clean-energy and infrastructure projects. As part of that solicitation, Defendants provided Heavy Metal with what they represented to be a legitimate letter of intent ("LOI") from a purported investment target. Plaintiffs later learned that the LOI was fabricated, causing Heavy Metal significant professional embarrassment. These misrepresentations continued into February 2025, when Defendants further claimed that Carbonatik had funded investor facilities and

mining concessions capable of immediate production and long-term offtakes—claims that were later admitted to be false.

14.    In February 2025, Defendants solicited Heavy Metal for a $500,000.00 investment in Carbonatik, ***promising a guaranteed 120% dividend beginning in July 2025 and continuing for 20 years thereafter.***  In so doing, Defendants represented, among other things, that Carbonatik had ***already funded*** investor facilities and mining concessions to support ***immediate production*** and long-term offtakes.  As set forth below, those representations were plainly false and inconsistent with Defendants' later admissions that they still needed $1–2 million merely to fund "preparatory work" and "trial shipments" and had not yet secured the promised financing or production capability.

15.    On February 4, 2025, Carbonatik Graminet, as "Seller," and David Smith and Richard Segerson, as "Purchaser," entered into a Share Purchase Agreement for Purchaser's purchase of 1% of the shares of Carbonatik Graminet. On the same day, Swaminathan and Fitzpatrick issued a 0.5% Membership Certificate to David C. Smith and a 0.5% Membership Certificate to Richard Segerson, certifying that each was the owner of 0.5 percent of Carbonatik Graminet.  A true and correct copy of the fully executed Share Purchase Agreement, with Swaminathan signing on behalf of Carbonatik Graminet, is attached hereto as **Exhibit "A."**  True and correct copies of the referenced membership certificates are attached hereto as **Exhibit "B"** and **Exhibit "C,"** respectively.

16. The Share Purchase Agreement and related transaction documents identify DaDEX as Carbonatik's "Financial & Equity Partner" and designate DaDEX as the entity responsible for managing financial instruments, including standby letters of credit ("SBLCs"), and operating the transaction "trade desk." Under the structure presented to Plaintiffs, any SBLC or financial collateral was required to be issued to accounts controlled by or designated by DaDEX.

17. By virtue of this role, DaDEX was not a passive third party, but an integral participant in the transaction structure, exercising control over the financial mechanisms through which investor funds and credit support were to flow.

18. Between February 10, 2025, and March 6, 2025 (in less than a month's time), Heavy Metal wire transferred to Carbonatik ten separate wire transfers, totaling $500,000.00. The funds were transmitted in multiple increments of approximately $50,000.00 as shown in the transfer records attached hereto as **Composite Exhibit "D."** On March 3, 2025, Fitzpatrick and Smith communicated, via text message, regarding the existence of the wire transfers. An excerpt of those extensive communications is attached hereto as **Composite Exhibit "E."**

19. On March 7, 2025, Fitzpatrick texted Smith regarding supposedly owning the rights to conduct exploration and extraction of the Mannar Basin and that all that was needed was $500 million and a "53-101" (referring to a NI 43-101 report). Referring to one of Smith's clients, Fitzpatrick stated: "Get us the specs so we can get **him [Heavy Metal's client]** the pricing and then he can

send the ICPO [Irrevocable Corporate Purchase Order]." (Emphasis added.)  In the same correspondence, Fitzpatrick also referenced a wholly separate graphite specifications relating to a different transaction, thus conflating the two suggested ventures.

20.    Although Fitzpatrick's March 7 text referenced providing "specs" so that one of Heavy Metal's clients could send an ICPO—language tied to graphite, not the Mannar Basin—Defendants simultaneously represented that they controlled the Mannar Basin and only needed funding to begin operations. ***These statements portrayed Carbonatik as already in control of significant exploration and extraction rights and in a position to transact immediately, which was inconsistent with Defendants' later inability to show any operations when Smith traveled to Africa (as explained below) and their subsequent failure to deliver even a single trial shipment.***

21.    Defendants, including DaDEX, used the involvement of a purported international financial partner to lend legitimacy to their representations regarding financing, credit facilities, and transaction capability.  The inclusion of DaDEX in the transaction structure was presented to Plaintiffs as evidence that Carbonatik had the financial infrastructure necessary to execute large-scale commodity transactions.

22.    Moreover, when Heavy Metal later identified a major prospective investor seeking additional information about the Mannar Basin, Fitzpatrick abruptly changed the terms and demanded $50 million merely for the investor to review the seismic data, contradicting Defendants' earlier statements that

Carbonatik already controlled the Basin and was seeking only a drilling partner. These shifting and inconsistent representations further illustrated that Defendants lacked any genuine rights or capability in the Mannar Basin and were misrepresenting both opportunities to induce Plaintiffs' continued involvement.

23.     On March 11 and March 13, 2025, Heavy Metal and Carbonatik executed a Broker Agreement, appointing Heavy Metal as a non-exclusive worldwide broker, with commissions and a two-year non-circumvention/confidentiality regime, governed by Florida law.  Carbonatik's published Rules of Engagement required formal onboarding (NDA/NCA), a Letter of Intent with specifications, proof of funds/financial commitment, and then FOB-based shipping.  A true and correct copy of the Broker Agreement is attached hereto as **Exhibit "F."** ***Consistent with Defendants' other representations, the Broker Agreement and Rules of Engagement were premised on the existence of real production capacity and the ability to ship copper and other commodities—all of which, as explained below, Carbonatik in fact lacked.***

24.     After the Broker Agreement was executed, Heavy Metal deployed more than 30 personnel throughout 2025 to market and sell copper and other commodities for Carbonatik.  During the same period, Carbonatik and its principals represented that production capacity and investor financing existed to support ***immediate deliveries*** and long-term offtakes, while Heavy Metal advanced or obtained commitments for the tender of substantial funds exceeding

55,000 metric tons of copper delivered monthly for the program for multi-year contracts with a value exceeding $6 billion per year for a minimum of three years. ***In reality (and as Defendants later admitted), Carbonatik had not secured the promised investor financing, still required a $1–2 million infusion merely to conduct "trial shipments," and never delivered any copper, rendering these prior representations materially false and inconsistent with Carbonatik's actual capabilities.***

25.   On March 17, 2025, Fitzpatrick texted Smith, indicating that he would "sell one more point of graminet if you know anyone.  I have one reserved for My Wife [sic] But she is fine anyway lol."  Fitzpatrick and his spouse are a "celebrity couple" who are claimed to have great wealth and whose "lavish wedding" in 2022 was published in People Magazine.  A true and correct copy of the March 17 text message is attached hereto as **Exhibit "G."**  ***Defendants used this image of wealth and social prominence to reassure Heavy Metal about Carbonatik's stability and creditworthiness, which was inconsistent with their subsequent admissions that they lacked even modest working capital and needed new funds to perform basic preparatory work.***

26.   On March 20, 2025, Fitzpatrick texted Smith, stating:

So I just got confirmation that we will have the 43101 on April 15 it's longer than expected but it's a drop dead date and could potentially have 1 week earlier.  So we're golden. . . . We ***own*** the mannar oil basin[.]  We ***own*** 30 million tonnes of graphite reserves[.]  We ***own*** 20 million tonnes of copper ore reserves[.]  It didn't happen overnight !  Now we are ready to ***fucking*** deliver.  It was all built for 2025.  That's without getting into lithium owned or other rare earth owned etc.  You have no ***fucking*** idea !  You're [sic] knowledge of what we have is just scratching the surface lol."  To induce an investment, Fitzpatrick then coached

> Smith to "[j]ust have him [Heavy Metal's client] put a UCC on our above ground graphite and copper[.]  Combined it's worth more than 13.5m[.]  We have 2000 tonnes of graphite stored and 5000 of copper ore[.]

A true and correct copy of the March 20 text message is attached hereto as **Exhibit "H."**  ***These sweeping assertions of ownership of the Mannar Basin, tens of millions of tons of reserves, and thousands of tons of above-ground inventory, coupled with a "drop dead" promise of a 43-101 by April 15 and the assurance "we're golden" and "ready to . . . deliver," were materially inconsistent with Defendants' subsequent inability to deliver any metals, obtain the promised $250 million line of credit, or even fund a small "trial shipment" without fresh investor money.***

27.    Throughout March 2025, Fitzpatrick repeatedly told Smith that multiple sovereign wealth funds and Middle Eastern banks were "lined up" and "fighting over" the opportunity to lend Carbonatik money at 3% APR, secured by the anticipated NI 43-101 report.  Fitzpatrick assured Plaintiffs that these lenders were prepared to immediately fund Carbonatik's operations and that the NI 43-101 would be issued by April 15, 2025.  Defendants knew that these statements were false.  As Defendants later admitted, no such financing existed; no lenders had committed to any facility; and Carbonatik lacked even minimal working capital.

28.    On April 11, 2025, Fitzpatrick wrote to Smith: "I had call with Sharjah bank this morning and our guys in Dubai.  They want us to open an account with the 43-101 when we have it and will issue us a 250m line of credit immediately.  So that's going to get a lot moving."  After this correspondence,

however, **nothing "moved"**: Heavy Metal received no copper or other metals ordered.  A true and correct copy of the April 11 text message is attached hereto as **Exhibit "I."**

29.    Moreover, Defendants promised that Heavy Metal would receive a return of its investment, plus a dividend to Smith and Segerson by July 4, 2025. Indeed, on June 6, 2025, Smith and Swaminathan engaged in the following text message exchange:

> ***Smith (6/6/25, 6:59 AM):*** That situation was not created by me . I was told a lot of things that aren't true . Rich and I both were told the money would be returned on July 4 2025 plus a dividend . Joe you have been straight with me and a gentlemen [sic] all along so that's why I'm asking what the cash needs are . I may be able to help .  tell me what the offered return would be and how long the cash is needed . I've jumped through a lot of hoops to help .  it's been a full time job so I want carbonatik to succeed as much as you do

> ***Swaminathan (6/6/25, 7:17 AM):*** Yes I totally understand that there was lot of misinformation on Brendan's etc.  The reason why I said what I said was purely because I don't want to have any more misunderstandings.  You and your team have been working on many things for us and I don't want to spoil the relationship in any way.  And with all of the discussions we've had so far I can understand that you're vary [sic: wary] of taking undue risks and that's why I wanted to work more risk free solutions for this[.]  Having said that, yes I do need funds asap. I have a lot of preparatory work to do not only in Zambia and Tanzania but also in Sri Lanka and Florida with the warehouse etc.

> [A financier] is funding 1 million for the trial though I haven't received it yet[.]  I'll have it either today or on Monday latest[.] Apart from the 1 million minimum required for the trial shipment I also would need 1 to 2 million to take care of many other requirements .  Yes, 1 or 2 mil now will help a great deal but I had planned it out as and when I get the 80 million monetised after the trial shipment[.]

A true and correct copy of the June 6 text message is attached hereto as **Exhibit "J."** *These messages constitute explicit admissions that (a) "a lot of things" previously told to Plaintiffs "aren't true"; (b) there has been "a lot of misinformation on Brendan's side etc."; and (c) contrary to Defendants' earlier claims of funded facilities, existing investor financing, and immediate delivery capability, Carbonatik still needed $1–2 million of new money merely to do preparatory work and fund a "trial shipment," and had not obtained the promised $250 million line of credit or monetized any "80 million." Moreover, despite Defendants' knowledge of Plaintiff's wire transfers and their assurances described above and below, Carbonatik never returned the $500,000.00 investment or delivered any copper, as promised.*

30. On June 24, 2025, Swaminathan text messaged a picture of copper ore to Smith to assuage Plaintiffs' concerns about the lack of delivery and apparent inability to deliver the ordered metals. Despite repeated promises on almost a daily basis over a period of several months, Carbonatik failed to deliver any copper shipments or to return the investment funds. *Swaminathan's need to rely on an isolated photograph of ore—rather than actual shipments or site inspections—further underscores the inconsistency between Defendants' earlier boasts of ready production, substantial above-ground inventory, and massive reserves, and their actual inability to produce or ship any copper or other metals.*

31.   On July 7, 2025, Heavy Metal's affiliate company—Heavy Metal Consulting, LLC—wire transferred $50,000.00 to Swaminathan personally for "Grade A Copper Cathode – 6 Metric Tons" per Invoice No. INV-000021.   No copper was ever delivered, and the $50,000.00 was never returned.

32.   Because of the delivery failures and multiple broken promises, Smith arranged with Carbonatik to personally visit Africa for the purpose of viewing the operations.   However, when arriving in Africa after some 30 hours of travel, no one from Carbonatik ever met with Smith or even responded to any of his communications.   Since returning to the United States, Smith has repeatedly requested information from Carbonatik.   On each such occasion, Carbonatik promised to provide it but then failed to do so, except to briefly show (*but not share*) a contract between itself and a private equity firm, whose identity was disclosed but whose identity is intentionally omitted from this Complaint. ***Defendants' refusal or inability to show Smith any actual operations or genuine agreements is irreconcilable with their prior representations that they owned the Mannar Basin, controlled tens of millions of tons of reserves, maintained thousands of tons of above-ground inventory, had secured investor financing and a forthcoming $250 million credit line, and were "ready to . . . deliver" in 2025.***

33.   Additionally, Heavy Metal has identified several potential misrepresentations and inconsistencies in promotional materials and information provided to Heavy Metal by Carbonatik, including the following:

a. **Capacity/Stock and Mine Count.**   Carbonatik's February 17, 2025, overview packet states >20 mines (4 active), 2,000 tons ready-to-ship, and 25,000 MT/month capacity scalable to 100,000 MT/month.  A later "copy" packet states 5 active mines, 1,000 tons available, and only 4,000 MT/month capacity—materially lower. Plaintiffs later discovered that Carbonatik owned **zero** tons of any minerals and had no inventory whatsoever.   Contrary to Swaminathan's claims that Carbonatik owned or operated a smelting facility in Zambia, Carbonatik did not own any smelting operation, mine, stockpile, or mineral rights.   All minerals referenced in Defendants' investor materials and text messages were, in fact, owned by either foreign governments or third-party companies, none of whom had been paid by Carbonatik, and none of whom had released any product.

b. **Concession/Rights Claims.**   Carbonatik circulated a 10-year Mannar Basin plan framed as an MOU/addendum under Sri Lankan law (Petroleum Resources Act), which on its face is not a concession instrument.   Yet, contemporaneous texts assert, "We own the rights for exploration and extraction" and the need for $500M to begin, referencing a "43-101" for the basin—an inapt disclosure rubric in this context.

c. **Offtakes/Investor Funding.**   The message threads show shifting positions about specifications, ICPO drafts, and price points

- 13 -

($5,000/MT to $4,000–$4,500/MT), with no executed offtake or ICPO committed on the record.  Defendants also misrepresented their rights to graphite in Sri Lanka.  Carbonatik repeatedly told Plaintiffs that it owned the graphite "free and clear" and had thousands of tons available for immediate shipment.  Plaintiffs later learned that Carbonatik had not paid the Sri Lankan government for any graphite, and the government refused to release even a single ton until full payment was received.  In fact, Carbonatik had no ownership interest, no valid concession, and no lawful authority to sell or ship any Sri Lankan graphite.

d. **Extraordinary Guaranteed Returns.**  The Share Purchase Agreement grants two micro-holders (0.5% each) ~US$1.2M/year for 20 years starting in July 2025, despite the absence of binding sales. Taken together, each Membership Certificate reflects those grants.

34. On information and belief, DaDEX knowingly participated in the structuring and facilitation of the transactions described herein, including by agreeing to receive, control, or direct SBLC instruments and related financial arrangements despite the absence of any underlying legitimate commodity operations, inventory, or financing capacity.

35. Carbonatik's communications reflect repeated pressure for additional wire transfers, often in $50,000.00 increments, contrary to its own published Rules of Engagement requiring formal POF/LC-based transactions. The exchanges also include refund instructions that were never honored.  Again,

relying on Defendants' representations (including fabricated documentation and false assurances of imminent delivery), Heavy Metal expended substantial resources and arranged investment commitments for over 55,000 metric tons of copper. Heavy Metal later discovered that Defendants had made similar fraudulent solicitations to other entities and individuals, using the same misrepresentations and materials. After Smith traveled to Africa and was completely ignored by Carbonatik personnel, Defendants then claimed that a "new investor" had emerged who would repay Heavy Metal and all other victims "within a week." Two months passed, but there was no repayment, no communication from this purported investor, and no evidence that such an investor existed. Even if such an investor were real, Heavy Metal reasonably feared that any repayment would be funded through a furtherance of a Ponzi-style scheme using new investor money to satisfy prior undisclosed liabilities.

36. Defendants were simultaneously engaged in another independent scheme involving Premiere Properties, Inc., as evidenced by filings in *Premiere Properties, Inc. v. Carbonatik, LLC, Carbonatik Graminet, LLC, Brendan Fitzpatrick, and Joseph Swaminathan*, Case No. 2024-CA-005651, pending in the Twelfth Judicial Circuit in and for Sarasota County, Florida. In that action, Defendants incurred more than $4.4 million in debt under multiple promissory notes issued in 2023 and 2024.

37. On May 2, 2025, Defendants executed a written Settlement Agreement with Premiere Properties, agreeing to liability for $4,425,500.00 and to the entry of a Stipulated Final Judgment in that amount on any breach.

Defendants were required to make an initial $250,000.00 payment by May 16, 2025.  Defendants immediately defaulted, even after an extension to May 26, 2025.

38.    On June 23, 2025, Premiere Properties filed a Verified Complaint to Enforce Settlement Agreement and for Entry of Final Judgment, which included a copy of the Settlement Agreement.  A true and correct copy of Premiere Properties, Inc.'s Verified Complaint to Enforce Settlement Agreement and for Entry of Final Judgment is attached hereto as **Exhibit "K."**

39.    In the same case, Premiere Properties obtained a turnover order compelling Defendants to surrender a purported multi-million-dollar gemstone (a "blue sapphire") pledged as collateral after Defendants failed to honor the terms of the Stipulated Final Judgment.  Defendants' conduct in the Sarasota case illustrates the same pattern of false promises, fabricated collateral, solicitation of funds under false pretenses, and immediate default/breach of contract.  Defendants repeatedly represented that they had substantial wealth, assets, minerals, operational capacity, and financing, when they were in fact insolvent, defaulting on multimillion-dollar debts and unable to perform their contractual obligations.  This pattern corroborates Plaintiffs' allegations that Defendants engaged in a systematic scheme to obtain money from multiple victims through fraudulent misrepresentations, omissions, and deception. Moreover, such conduct is characteristic of Ponzi-scheme, whereby new investor funds are misappropriated for the purpose of paying prior undisclosed debts.

40.     On March 9, 2026, the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida, entered an Order Granting Sequestration and Appointment of Receiver, a copy of which is attached hereto as **Exhibit "L."** In that case, Defendants have ignored court orders to produce documents and other information in aid of execution, resulting in the entry of orders to compel, including information as simple as a Florida Rule of Civil Procedure, Form 1.977 (Fact Information Sheet).

41.     Defendants concealed from Plaintiffs that they were insolvent, in default on multiple promissory notes, and had entered a $4.425 million settlement that required an immediate six-figure payment.  Instead, Defendants represented that Plaintiffs' $500,000.00 investment would be used for copper procurement, logistics, and operational activities, when Defendants appear to have been attempting to divert new investor funds to satisfy its prior investor obligations—a hallmark of a Ponzi-style operation.

42.     Plaintiffs have retained The Carlin Law Firm, PLLC to represent it in these proceedings and agreed to pay a reasonable fee for the representation.

### COUNT 1 – SECURITIES FRAUD / VIOLATION OF SECTION 10(b) AND RULE 10b-5
### (All Plaintiffs Against All Defendants)

43.     Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

44.     Defendants, directly and indirectly, used interstate commerce to employ a scheme to defraud Plaintiffs in connection with the purchase or sale of securities in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

45.     DaDEX participated in the fraudulent scheme by structuring and facilitating the financial framework through which Defendants solicited Plaintiffs' investment, including by serving as the designated recipient and controller of SBLC instruments and related financial mechanisms, thereby enabling and lending credibility to Defendants' misrepresentations.

46.     Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— (b) To use or employ, in connection with the purchase or sale of any security... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...

47.     Further, SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful for any person, directly or indirectly... (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

48.     Defendants made material misrepresentations and omissions regarding mine ownership, funding, and returns.

49.     Defendants acted with scienter, knowing that their statements were false, or in reckless disregard of the falsity of the statements.

50.     Defendants' intent to deceive, manipulate, or defraud is further demonstrated by their continuous assurances of imminent shipments, fabricated investor materials, and shifting explanations regarding capacity and financing.

51.     Defendants' fraudulent statements were made in connection with Plaintiffs' purchase of securities, including the February 2025 Share Purchase Agreement and the corresponding $500,000.00 paid for a 1% equity interest in Carbonatik Graminet.

52.     Defendants explicitly used these statements to induce Plaintiffs to purchase equity interests and to fund Carbonatik's operations.

53.     Plaintiffs reasonably relied on Defendants' misrepresentations about ownership of minerals, reserves, financing, production capability, inventory, concessions, guaranteed dividends, and delivery capability. Plaintiffs would not have purchased the securities or wired funds had they known the truth.

54.     Because of Defendants' securities fraud, Plaintiffs have suffered substantial economic damages, including lost profits.

55.     Plaintiffs' losses were proximately caused by Defendants' securities fraud.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and severally, for compensatory damages, consequential (special) damages, prejudgment interest,

attorneys' fees, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

### COUNT 2 – VIOLATIONS OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT ("FSIPA"), §§ 517.301, *ET SEQ.*, FLA. STAT. (All Plaintiffs Against All Defendants)

56.     Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

57.     Section 517.301, *Florida Statutes*, provides as follows:

In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security… it is unlawful and a violation of this chapter for a person, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;
2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

*See* § 517.301, Fla. Stat. (2025).

58.     Defendants offered and sold securities to Plaintiffs in Florida, including a 1% ownership interest in Carbonatik Graminet, in exchange for Plaintiffs' $500,000.00 investment.

59.     These transactions occurred within the State of Florida, and Plaintiffs are within the class of investors that FSIPA is designed to protect.

60.     In connection with the offer and sale of these securities, Defendants directly and indirectly made untrue statements of material fact and omitted material facts, including, but not limited to, false representations that: (1)

Carbonatik owned or controlled the Mannar Basin, 30 million tons of graphite, and 20 million tons of copper ore; (2) Carbonatik possessed thousands of tons of above-ground inventory and ready-to-ship copper and graphite; (3) Carbonatik had operational mines, smelting facilities, and active concessions; (4) sovereign wealth and Middle-Eastern banks were "lined up" to lend at 3% APR and would issue a $250 million credit line upon issuance of an NI 43-101; (5) Carbonatik had funded investor facilities and production capacity; (6) Plaintiffs' investment would yield a guaranteed 120% dividend for 20 years; and (7) Carbonatik could make immediate copper deliveries.

61.    Defendants concealed that: (1) Carbonatik owned no minerals; (2) no concessions existed; (3) no lender financing existed; (4) Carbonatik lacked even minimal working capital; and (5) and no shipments were possible.

62.    Because of Defendants' securities fraud, Plaintiffs have suffered substantial economic damages, including lost profits.

63.    Plaintiffs' losses were proximately caused by Defendants' securities fraud.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and severally, for compensatory damages, consequential (special) damages, prejudgment interest, attorneys' fees, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

**COUNT 3 – FLORIDA CIVIL REMEDIES FOR CRIMINAL VIOLATIONS**
**UNDER FLA. STAT. § 772.101, *ET SEQ.***
**(All Plaintiffs Against All Defendants)**

64.    Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

65.    At all material times, Defendants received proceeds derived from a pattern of criminal activity, having engaged in a systematic and repeated course of conduct intended to defraud Plaintiffs by false or fraudulent means in violation of section 817.034(4)(a), *Florida Statutes*, including, but not limited to: (1) soliciting Plaintiffs' $500,000.00 investment through knowingly false representations of mineral ownership, inventory, production capacity, financing, and operational readiness; (2) soliciting an additional $50,000.00 for an undeliverable copper shipment; and (3) engaging in similar fraudulent conduct toward other victims, including the $4.4 million Premiere Properties scheme resulting in a Stipulated Final Judgment.

66.    Thus, Defendants committed multiple predicate acts of racketeering activity, including wire fraud in violation of 18 U.S.C. § 1343, through interstate text messages, phone calls, and electronic communications.  These predicate acts include, but are not limited to: (1) February–March 2025 communications by Fitzpatrick falsely representing that Carbonatik owned the Mannar Basin and millions of tons of mineral reserves; (2) March 20, 2025 text messages falsely claiming ownership of 30 million tonnes of graphite and 20 million tonnes of copper ore; (3) repeated March–April 2025 communications falsely stating that sovereign wealth funds and Middle Eastern banks were committed to providing

financing; (4) April 11, 2025 communications falsely representing that a $250 million line of credit would be issued; and (5) June 2025 communications acknowledging prior misinformation while continuing to solicit additional funds. Each of the foregoing communications was transmitted via interstate wires and constituted a scheme to defraud Plaintiffs of money and property. The same wire fraud and scheme was perpetrated against non-party Premiere Properties.

67. Additionally, on November 17, 2025, Defendants issued a press release representing that they had "entered into a landmark investment agreement with the Government of Andhra Pradesh, signing a Memorandum of Understanding (MoU) valued at ₹31,500 crore (US $3.75 billion) during the CII Partnership Summit 2025 held in Visakhapatnam." A true and correct copy of the release—which features photographs of the individual Defendants in this case—is attached hereto as **Exhibit "M."**

68. Defendants have acted in association with an enterprise—consisting of Carbonatik, LLC, Carbonatik Graminet, LLC, Fitzpatrick, Swaminathan, and DaDEX—and directly participated in the formation and conduct of that enterprise through a pattern of criminal activity, including violations of sections 817.034(4)(a), 517.301, and 812.014, *Florida Statutes*, and other predicate acts set forth in chapter 772.

69. The criminal activity was not isolated but was a pattern of regular conduct.

70. Defendants misappropriated or permanently deprived Plaintiffs of their property through fraudulent means in violation of sections 772.103 and

817.034(4)(a), *Florida Statutes.* Defendants knew they owned no minerals, had no concessions or inventory, had no financing, and could not perform their contractual obligations, yet induced Plaintiffs to transfer funds for their own benefit.

71. Defendants knowingly conducted or attempted to conduct transactions with the misappropriated funds belonging to Plaintiffs—including transferring funds to third parties, using Plaintiffs' money for personal purposes, and concealing the receipt and disposition of funds knowing that the transactions involved the proceeds of unlawful activity, all with the intent to promote the ongoing unlawful activity, in violation of sections 772.103 and 817.034(4)(a).

72. Defendants engaged in a scheme to defraud Plaintiffs through a systematic and ongoing course of conduct with the intent to obtain their property thereby, in violation of sections 772.103 and 817.034(4)(a).

73. Defendants' unlawful actions occurred over a period of many months, across multiple jurisdictions, and involved numerous communications, solicitations, victims, and fabricated reassurances. Moreover, the conduct was not isolated, so there exists an ongoing threat of continued criminal activity, including continuing solicitations of investors, as evidenced by Defendants' contemporaneous fraud against Premiere Properties and others.

74. Defendants' racketeering activity constitutes a pattern because it involved multiple predicate acts over a period of months (if not years), directed at multiple victims, including Plaintiffs and other investors.

75. After January 16, 2026 (after this lawsuit was filed), Defendants circulated to multiple investors, including Plaintiffs, an obviously doctored bank statement purporting to show a current balance of $108,468,346.47 and a 12-month average balance of $142,316,784.00. The doctored bank statement is attached hereto as **Exhibit "N."** The alterations are obvious because the letters and numbers are not horizontally aligned. Moreover, with so much money involved, it is curious that the exact amount of the average balance over a 12-month period would be a round number (*i.e.*, no pennies or cents).

76. Defendants engaged in closed-ended continuity, as the predicate acts occurred over a substantial period of time, and open-ended continuity, as Defendants continued soliciting additional investors using the same misrepresentations.

77. The scheme was not a single isolated transaction, but an ongoing enterprise designed to repeatedly obtain funds through fraudulent inducement.

78. As a direct and proximate result of Defendants' criminal activity, Plaintiffs have been damaged.

79. Pursuant to section 772.104(1), Plaintiffs are entitled to recover their reasonable attorneys' fees from Defendants if they are the prevailing party in this action.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and severally, for

compensatory damages, treble damages, prejudgment interest, attorneys' fees, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

## COUNT 4 – COMMON LAW FRAUD
### (All Plaintiffs Against All Defendants)

80.    Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

81.    Defendants knowingly made false statements about Carbonatik's finances, operations, and ability to deliver copper.

82.    Defendants, including Fitzpatrick and Swaminathan, made multiple false representations of material fact to Plaintiffs in specific oral conversations and written messages between January and April 2025, including, but not limited to:

a. Carbonatik owned and controlled the Mannar Basin;

b. Carbonatik owned thousands of tons of copper and graphite ready for immediate shipment;

c. Carbonatik had secured sovereign wealth-fund financing and bank credit lines to support the operations;

d. Carbonatik had operating mines, funded facilities, and active concessions;

e. Plaintiffs' investment would yield a guaranteed 120% annual dividend beginning July 2025;

f. Carbonatik had paid the Sri Lankan government for rights to above-ground graphite stockpiles; and

g. Carbonatik had the ability and intention to deliver copper within weeks of receiving Plaintiffs' payment.

h. The transaction structure, including the involvement of DaDEX as a financial intermediary and SBLC controller, reflected a legitimate and financeable commodity transaction supported by real assets and credit capacity.

83. When making the above statements, Defendants knew that the statements were false.

84. Defendants intended Plaintiffs to rely on those statements.

85. Plaintiffs justifiably relied on the statements and, because of such reliance, suffered damages, including lost profits.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and severally, for compensatory damages, consequential (special) damages, punitive damages, prejudgment interest, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

## COUNT 5 – BREACH OF CONTRACT (BROKER AGREEMENT)
### (Plaintiff Heavy Metal Capital Partners, LLC Against Carbonatik, LLC)

86.     Plaintiff, Heavy Metal Capital Partners, LLC, adopts, re-alleges, and incorporates by reference paragraphs 8 through 42.

87.     Plaintiff and Carbonatik, LLC entered into a valid Broker Agreement.

88.     Plaintiff performed or stood ready to perform.

89.     Carbonatik, LLC breached the Broker Agreement by: (1) failing to deliver any copper or other commodities for transactions Heavy Metal procured; (2) failing to pay Heavy Metal contractual commissions; (3) refusing to honor its own Rules of Engagement, including by demanding *ad hoc* additional funding, rather than processing transactions through standard ICPO/POF-based pathways; (4) circumventing Heavy Metal with third parties and concealing communications with Heavy Metal's originated buyers; (5) ignoring requests for shipping schedules, performance documentation, audit data, and customary transaction paperwork; and (6) failing to return funds or issue refunds when transactions collapsed due to Carbonatik's inability to perform.

90.     As a result of the stated breaches, Plaintiff has been damaged.  In addition to compensatory damages, Plaintiffs should be awarded consequential (special) damages, including lost profits and terminated business relationships with those whom Plaintiff contacted pursuant to the Broker Agreement.

91.     Under paragraph 9 of the Broker Agreement, Plaintiff is entitled to recover its reasonable attorneys' fees and costs from Defendant if Plaintiff is the prevailing party in this action.

WHEREFORE, Plaintiff, Heavy Metal Capital Partners, LLC, demands

judgment against Defendant, Carbonatik, LLC, for compensatory damages, consequential (special) damages, prejudgment interest, attorneys' fees, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

### COUNT 6 – BREACH OF CONTRACT (SHARE PURCHASE AGREEMENT)
### (Plaintiffs Smith and Segerson Against Carbonatik Graminet, LLC)

92.    Plaintiffs, David C. Smith and Richard H. Segerson, adopt, re-allege, and incorporate by reference paragraphs 3 through 4 and 15 through 42.

93.    Plaintiffs and Carbonatik Graminet entered into a valid Share Purchase Agreement.

94.    Plaintiffs performed or stood ready to perform.

95.    Carbonatik Graminet breached by failing to deliver shipments, pay commissions, or refund funds.

96.    As a result of the breach, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs, David C. Smith and Richard H. Segerson, demand judgment against Defendant, Carbonatik Graminet, LLC, for compensatory damages, prejudgment interest, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

### COUNT 7 – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE
### PRACTICES ACT ("FDUTPA"), FLA. STAT §§ 501.201 *ET SEQ.*
### (All Plaintiffs Against All Defendants)

97.    Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

98.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

renders unlawful methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices in the conduct of any trade or commerce. *See* § 501.204, Fla. Stat. (2025).

99.    Defendants, including DaDEX, were each engaged in "trade or commerce" under section 501.204, *Florida Statutes,* because they marketed, promoted, solicited investment for, and purported to sell commodities, mining outputs, and investment opportunities to Plaintiffs in Florida and abroad.  Their conduct squarely falls within FDUTPA's broad statutory reach, which is liberally construed.

100.    Defendants committed multiple "deceptive" and "unfair" acts within the meaning of FDUTPA, including, but not limited to, misrepresenting: (1) ownership of the Mannar Basin, copper reserves, graphite reserves, and tens of millions of tons of mineral ore when Carbonatik owned no such assets; (2) inventory claiming to have thousands of tons of above-ground copper and graphite and active production capacity, when Carbonatik owned zero minerals; (3) financing, repeatedly claiming that it had sovereign wealth funds, Middle Eastern bank contacts, and a Sharjah Bank LOC that was "lined up" to lend at 3% APR—none of which existed; (4) operations, including claims of smelting facilities, active mines, funded concessions, and "operational readiness" across Africa and Sri Lanka; (5) deliverability, promising immediate copper shipments and guaranteed on-time deliveries despite having no ability to mine, procure, or ship product; (6) furnishing fabricated documents, including a fake LOI, inconsistent mine-capacity packets, and materials falsely representing

- 30 -

ownership and production capability; and concealing material facts, including that none of the minerals were paid for, none of the concessions were valid, no NI 43-101 report would issue, and Carbonatik lacked basic operating capital.

101.   The individual Defendants, Swaminathan and Fitzpatrick, actively participated in or had some measure of control over the deceptive and improper dealings.

102.   DaDEX's conduct—including its role in structuring and facilitating the financial aspects of the transaction—constituted participation in the deceptive and unfair practices described herein.

103.   Because of Defendants' unfair and deceptive practices, Plaintiffs have been damaged.

104.   Defendants are the proximate cause of Plaintiffs' actual damages.

105.   Under section 501.2105, *Florida Statutes*, Plaintiffs are entitled to recover their reasonable attorneys' fees and costs from Defendants if Plaintiffs are the prevailing party in this action.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and severally, for compensatory damages (measured as actual damages under FDUTPA), prejudgment interest, attorneys' fees, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

### COUNT 8 – AIDING AND ABETTING FRAUD
### (All Plaintiffs Against Swaminathan, Fitzpatrick, and DaDEX)

106.   Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1-55; 57-63; and 75-79.

107.   This is an action, pled in the alternative, for aiding and abetting fraud, and is asserted only if the Court or the jury finds that Defendants Swaminathan and Fitzpatrick have not engaged in direct fraud as set forth in Count 4.

108.   A primary fraud was committed by Carbonatik, LLC and Carbonatik Graminet, LLC (the "Corporate Defendants"), which—through coordinated written and oral communications—made numerous false statements regarding: (1) ownership of the Mannar Basin, copper reserves, graphite reserves, and other mineral concessions; (2) the existence of thousands of tons of above-ground inventory ready for shipment; (3) sovereign wealth and bank financing, including a promised $250 million Sharjah Bank credit line; (4) guaranteed 120% annual dividends; and (5) the ability to deliver copper within weeks.

109.   These misrepresentations were knowingly false, material, and intended to induce Plaintiffs to invest $500,000.00, an affiliate entity to pay an additional $50,000.00, and deploy substantial business resources.

110.   Defendants Swaminathan and Fitzpatrick had knowledge of the fraud and provided substantial assistance, both individually and separate and apart from the Corporate Defendants, by: (1) jointly soliciting Plaintiffs' investment; (2) drafting, transmitting, and circulating false investor packets, capacity sheets, and other communications; (3) reinforcing and ratifying

misrepresentations after learning they were false; (4) concealing Carbonatik's insolvency and inability to perform; (5) demanding additional wire transfers contrary to their own rules of engagement; (6) directing the use of Plaintiffs' funds for purposes unrelated to the promised transactions; (7) "ghosting" Smith during his Africa trip to avoid scrutiny; and (8) fabricating new stories about a purported new investor when confronted about the failed promises.

111.   DaDEX had knowledge of the fraudulent scheme or acted with reckless disregard for the truth and provided substantial assistance by: (a) agreeing to act as the designated financial intermediary for SBLC issuance and related financial instruments; (b) structuring the transaction such that investor-backed credit instruments would be issued to accounts under its control or direction; (c) lending the appearance of legitimacy and financial sophistication to Defendants' scheme; (d) facilitating or agreeing to facilitate financial transactions despite the absence of any legitimate underlying commodity operations; (e) during June and July 2025, soliciting Plaintiffs to provide an additional $2,000,000.00 for a purported smelter investment and related Carbonatik operations.

112.   As a direct and proximate result of Swaminathan's and Fitzpatrick's knowing and substantial assistance in the fraudulent scheme, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and

severally, for compensatory damages, punitive damages, prejudgment interest, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

## COUNT 9 – CIVIL CONSPIRACY TO DEFRAUD
### (All Plaintiffs Against All Defendants)

113.  Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

114.  Defendants, including DaDEX, agreed to a common plan to defraud Plaintiffs.

115.  This agreement is evidenced by coordinated text messages, mirrored representations, shared documents, synchronized solicitations, and the intentional concealment of the truth.

116.   In furtherance of the conspiracy, Defendants: (1) repeated the same false claims about concessions, mines, and inventory; (2) issued multiple rounds of false reassurances and promises of shipments; (3) demanded funds inconsistent with their own engagement rules; (4) concealed Carbonatik's inability to supply any minerals; (5) fabricated financing stories to keep Plaintiffs engaged; and (6) used Plaintiffs' funds without delivering any promised products or returns.

117.  DaDEX knowingly joined and participated in the conspiracy by agreeing to serve as the financial intermediary and SBLC controller for the scheme, thereby enabling Defendants to solicit funds and induce reliance through the appearance of a legitimate, bank-supported transaction structure.

118. The conspiracy resulted in, and was intertwined with, the fraudulent conduct alleged in the "General Facts" section and in Count 3—fraud that Defendants jointly conceived, executed, and concealed.

119. Defendants Swaminathan and Fitzpatrick acted outside the scope of their corporate roles and for personal financial gain, including the diversion and misuse of funds obtained from Plaintiffs.

120. Defendants had an independent personal stake in the fraudulent scheme, including retaining funds for personal use and attempting to satisfy unrelated debts and obligations using investor money.

121. Accordingly, the intra-corporate conspiracy doctrine does not apply.

122. Plaintiffs were directly and proximately harmed by the conspiracy, including loss of invested funds, additional payments, reliance expenditures, reputational harm, and other consequential damages.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, for compensatory damages, consequential (special) damages, punitive damages, prejudgment interest, attorneys' fees, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

### COUNT 10 – CONSTRUCTIVE FRAUD / BREACH OF FIDUCIARY DUTY
### (All Plaintiffs Against Defendant Swaminathan)

123.   Plaintiffs adopt, re-allege, and incorporate by reference paragraphs 1 through 42.

124.   Swaminathan owed fiduciary duties to Plaintiffs Smith and Segerson as members of Carbonatik Graminet, LLC, arising from his role as co-manager of the LLC, as well as from the parties' investment relationship and his express and implied assurances of oversight, safeguarding of funds, and operational stewardship. These duties included obligations of loyalty, care, full disclosure, and the duty to act in the best interests of the members.

125.   Plaintiffs placed trust and confidence in Swaminathan as the individual responsible for Carbonatik's financial, operational, and investor functions, thereby further giving rise to fiduciary obligations.   These duties required Swaminathan to: (1) accurately disclose the financial condition and operational status of Carbonatik; (2) refrain from misusing investor funds; (3) avoid self-dealing or diversion of funds; and (4) provide truthful information regarding investments and operations.

126.   He breached those duties by: (1) misappropriating funds; (2) concealing Carbonatik's true financial status; (3) misrepresenting financing and production capability; (4) concealing material information and providing fabricated or misleading documentation; (5) demanding additional funds while knowing shipments were impossible; and (6) failing to safeguard Plaintiffs' investment or act in their best interests.

127. By virtue of the fiduciary relationship, Swaminathan's misrepresentations and concealments constituted constructive fraud, because they violated the trust and confidence Plaintiffs placed in him and were used to induce financial contributions he knew Carbonatik could not honor.

128. As a direct and proximate result, Plaintiffs suffered damages, including loss of invested funds, additional payments, operational costs, and consequential damages.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendant, Joseph K. Swaminathan a/k/a Joseph Swaminath, for compensatory damages, punitive damages, prejudgment interest, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

## COUNT 11 – UNJUST ENRICHMENT
### (Plaintiff Heavy Metal Capital Partners, LLC Against All Defendants)

129. Plaintiff adopts, re-alleges, and incorporates by reference paragraphs 1 through 42.

130. Plaintiff conferred substantial and direct benefits on Defendants, including DaDEX, including, but not limited to: (1) the $500,000.00 investment solicited on the basis of Defendants' representations about Carbonatik's operations, financing, concessions, and mineral ownership; (2) the deployment of more than 30 personnel, business development resources, and operational support to advance Carbonatik's purported mineral-sales programs; (3) the procurement of multi-year buyer commitments, introductions, and commercial

opportunities that Carbonatik could not have obtained on its own; and (4) reputational and logistical support that Defendants used to bolster their credibility with investors and third parties.

131. On information and belief, DaDEX received financial or transactional benefits, including fees, control over financial instruments, or other economic advantages, because of its role in the transactions described herein.

132. A portion of the funds transferred by Plaintiffs was paid directly to or controlled by Swaminathan and Fitzpatrick, including the $50,000.00 wire to Swaminathan personally.

133. Defendants used Plaintiffs' funds for non-operational and personal purposes, including expenses unrelated to any legitimate mineral procurement, shipping, or business activity.

134. Swaminathan and Fitzpatrick therefore personally received and retained benefits from Plaintiffs' funds.

135. Defendants knowingly retained those benefits, including the funds, commercial opportunities, and credibility enhancements that Plaintiffs provided.

136. It would be inequitable for Defendants to retain these benefits.

WHEREFORE, Plaintiffs, Heavy Metal Capital Partners, LLC, David C. Smith, and Richard H. Segerson, demand judgment against Defendants, Carbonatik, LLC, Carbonatik Graminet, LLC, Joseph K. Swaminathan a/k/a Joseph Swaminath, and Brendan Fitzpatrick, jointly and severally, for

restitution, prejudgment interest, court costs, and such other and further relief in law or equity as this Court may deem just and proper.

**JURY TRIAL DEMAND**

137.  Plaintiff demands a trial by jury on all issues so triable.

DATED: June 1, 2026.

> THE CARLIN LAW FIRM, PLLC
> *Attorneys for Plaintiffs*
> One Financial Plaza
> 100 S.E. 3rd Avenue, Suite 1103
> Fort Lauderdale, Florida 33394
> Tel.: (954) 440-0901
> Primary e-mail: eservice@carlinfirm.com
>
>
> By: ___/s/ Justin C. Carlin_____
> JUSTIN C. CARLIN, ESQ.
> Fla. Bar No.: 068429
> Sec. e-mail: jcarlin@carlinfirm.com
> Ter. e-mail: mpanico@carlinfirm.com